UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| TIMMOTHY MURPHY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:20 CV 154 RWS |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant.[1] | ) | |

## **MEMORANDUM AND ORDER**

Plaintiff Timmothy Murphy ("Murphy") brings this action pursuant to 42

U.S.C. § 405(g), seeking judicial review of the Social Security Commissioner's

("Commissioner") decision to deny his application for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI") benefits.  For the reasons

explained below, I will affirm the decision.

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

Murphy filed a Title II application for disability insurance benefits and Title XVI application for supplemental security income on December 18, 2017.[2]   The claims were initially denied on May 10, 2018 and after reconsideration, denied again.  Murphy filed a timely request for a hearing, which was held on September 11, 2019.  The ALJ issued his decision on November 13, 2019, finding that Murphy was not entitled to any benefits.  Murphy appealed and the Appeals Council denied his request for review on June 18, 2020.  Murphy then filed this case seeking judicial review of the Commissioner's decision.

In this action for judicial review, Murphy argues that the ALJ failed to properly consider a medical opinion offered by his treating physician, Dr. Richard Hester.  He contends that "Dr. Hester's opinion is consistent with and supported by other medical evidence in the record, [but] it is not consistent with the ALJ's RFC

---

[2] This was not Murphy's first application for Social Security benefits.  He first filed Title II and Title XVI applications on May 25, 2011.  The claims were initially denied on August 25, 2011 and after reconsideration, denied again.  Murphy filed a request for a hearing, which was held on January 10, 2014.  The ALJ denied Murphy's claims on January 23, 2014.  Murphy appealed the decision, the Appeals Council denied his request, and he then sought judicial review in this district court.  See Murphy v. Colvin, 2016 WL 4158868 (E.D. Mo. Aug. 5, 2016).  The district court reversed the ALJ's finding and remanded the case for reconsideration on one issue: whether the ALJ disregarded significant portions of the state agency psychological consultants' opinions about Murphy's mental capacity.

On remand from the Appeals Council, Murphy's case went before a different ALJ and a new hearing was held on June 28, 2017.  The ALJ considered the issue that the district court identified for reconsideration alongside new Title II and Title XVI claims that Murphy had filed on June 19, 2015.  The ALJ issued his decision on September 27, 2017, finding that Murphy was not entitled to any benefits.

assessment" and that the Commissioner's decision is not supported by substantial evidence on the record as a whole.

## LEGAL STANDARD

To be entitled to disability benefits, a claimant must prove that he is unable to perform any substantial gainful activity due to a medically-determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(a).  When determining whether a claimant is disabled, the Commissioner conducts a five-step analysis.  20 C.F.R. § 404.1520; Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).

Steps one through three require the claimant to show that (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii).  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five.  Step four requires the Commissioner to consider whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work.   Id. at § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating that he is no longer capable of returning to his past relevant work.  Pate-Fires, 564 F.3d at 942. If the Commissioner determines that the claimant cannot return to past relevant

work, the burden shifts to the Commissioner at step five to show that the claimant retains the RFC to perform other jobs that exist in significant numbers in the national economy.  Id., 20 C.F.R. § 404.1520(a)(4)(v).

In reviewing the ALJ's denial of Social Security disability benefits, my role is limited to determining whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  Pate-Fires, 564 F.3d at 942.  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, I must consider evidence that both supports and detracts from the Commissioner's decision.  Id.  I must "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (internal citation omitted).  I may not reverse a decision that is supported by substantial evidence in the record, even if substantial evidence in the record supports a contrary outcome, or if I would have decided the case differently in the first instance.  Johnson v. Astrue, 628 F.3d 991, 992 (8th Cir. 2011).

## ADMINISTRATIVE RECORD

With respect to the medical records and other evidence of record, I adopt Murphy's recitation of facts set forth in his brief, to the extent that they do not directly conflict with the Commissioner's Statement of Uncontroverted Material

4

Facts and are supported by the record.[3]   Additional specific facts will be discussed as needed to address the parties' arguments.

Murphy was 39 years old when his hearing before the ALJ took place.  At that time, he was homeless.  He has completed some high school but never received his diploma.  He was previously employed as a caulker (from 1999 to 2011) and as a production worker (from 2016 to 2017).  (Tr. 375.)  He suffers from degenerative disc disease, a seizure disorder, spondylosis, bipolar disorder, depression, and THC use disorder.  (Tr. 379.)  Murphy has had lumbar spine surgery twice: first in 1997 or 1998 following a motorcycle accident, and again in 2006.  (Tr. 554.)

During the relevant time period, Murphy saw several different healthcare providers for his various health problems.  He visited Dr. James Wilkerson at the Kneibert Clinic twice in 2016.  (Tr. 435.)  During his March 22, 2016 visit, Murphy complained of back pain and radicular pain in his left leg with numbness in his last three toes.  (Tr. 438.)  Dr. Wilkerson conducted a low back physical exam.  The results were all normal, with the exception of the straight leg raise for the left leg which yielded a "positive" result. (Tr. 439.)  Dr. Wilkerson also saw Murphy on April 8, 2016.  He reviewed Murphy's MRI, which "showed scar tissue around the post surgical [sic] areas in L4-5 and L5 S1 nerve roots with displacement of the S1

---

[3] Murphy did not file a statement of uncontroverted material facts with his initial brief as I instructed him to do in the case management order entered on July 27, 2020.  ECF No. [5].  As a result, I will rely on the statement of facts that he included in his initial brief.

nerve root." (Tr. 435.)  He also noted "no recent seizures or problems with meds reported." (Tr. 435.)

On February 20, 2017, Murphy sought treatment for his seizures at Saint Francis Medical Center. (Tr. 429-31.)  He reported suffering a grand mal seizure two days previously after being "electrocuted after stepping on a[n] electric cord and nail." (Tr. 429.)  He was "otherwise, doing well, compliant with meds, and without significant medical complaints." (Tr. 429.)  Dr. Kenneth Li, who examined Murphy, did not note any constitutional, musculoskeletal, or neurological abnormalities.[4] (Tr. 430.)  Murphy again sought treatment for his seizures on June 18, 2017 at the Poplar Bluff Regional Medical Center Emergency Department.  Dr. Carlos Rivas examined him and ordered lab tests after Murphy reported that he had suffered two generalized seizures earlier that day. (Tr. 418.)  Murphy tested positive for amphetamines, barbiturates, methamphetamine, cannabinoids, and benzodiazepines. (Tr. 420.)  The lab tests also revealed "low" levels of Dilantin, Murphy's prescribed anti-seizure medicine, although Murphy reported compliance with that prescription. (Tr. 431.)  Dr. Rivas gave Murphy a Cerebyx infusion and instructed him to follow up with his primary care physician, Dr. Richard Hester.

---

[4] Murphy saw Dr. Li again on August 9, 2017, presenting with complaints of poison ivy exposure and pain in his right wrist from playing softball. (Tr. 431.)  During this visit, Murphy did not report back pain, and indicated that he had not suffered a seizure since February 2017.

On October 17, 2017, Murphy visited the Emergency Department at Black River Medical Center.  He reported lower back pain, rating his pain as a 10 out of 10.  (Tr. 442.)  He arrived in "ambulatory" condition and reported that he could "ambulate independently and…perform all activities of daily living without assistance."  (Tr. 441-42.)  The physical examination revealed bilateral paralumbar tenderness.  (Tr. 443.)  The straight leg test for both legs was negative.  (Tr. 443.)  He was diagnosed with chronic low back pain and given a Toradol injection, which he reported helped decrease his pain.  (Tr. 443.)  He was discharged that day and instructed to follow up with Dr. Hester.  (Tr. 444.)

Throughout 2017 and 2018, Murphy had several appointments at FCC Behavioral Health.  (Tr. 469-89.)  At these appointments, he discussed his mental health issues and medications.  He underwent a mental health assessment on June 6, 2017, which involved a detailed "Strengths, Needs, Abilities and Preferences (SNAP) For Adults" questionnaire (Tr. 386-91), a "Mental Status Exam" (Tr. 393-94), a "Social Network Scale" assessment (Tr. 397-98), and an "Adult Daily Living Activities" assessment.  (Tr. 395-96.)  During his February 13, 2018 appointment, Murphy expressed his desire to "find a job as soon as possible" and in her plan notes, the provider recommended that he begin applying for jobs online.  (Tr. 474.)  At his appointment on March 19, 2018, Murphy was instructed to continue taking Aristada, begin seeing a therapist, and contact FCC, emergency services, or a suicide hotline

"sooner if mood worsens."  (Tr. 481-82.)  He "was stable upon discharge from this session" and "verbalized good understanding" of the treatment plan as described to him.  (Tr. 482.)  On several different occasions, providers emphasized the importance of "taking medications as prescribed" and "not…lend[ing] medications to others or tak[ing] medications from others without a prescription." (Tr. 402, 410, 481.)  Murphy was also advised to abstain from alcohol and cannabis use.  (Tr. 481.)

In October 2018, Murphy underwent an MRI of his lumbar spine without IV contrast at Poplar Bluff Regional Medical Center.  (Tr. 541.)  Dr. David Croyle, the radiologist, read the MRI.  His findings included:

1.  Surgical changes at L4-5 and L5-S1.  Probable worsening granulation tissue abutting the left L5 descending nerve root, which could be source for pain/radiculopathy.
2.  L-spine minor spondylosis, mild fact arthropathy, and multilevel DDD.
3.  Multilevel central canal stenosis at L2-3, L3-4, and L5-S1.
4.  Multilevel lumbar foraminal stenoses.

(Tr. 543.)

On November 30, 2018, Murphy went to the Poplar Bluff Emergency Department complaining of pain in his left leg.  (Tr. 524.)  He reported that the pain medication he had been taking was no longer effective.  (Tr. 524.)  He rated his pain as a 9 out of 10.  (Tr. 527.)  The provider noted that he was experiencing "[p]ain and numbness of the left foot, worse than usual."  (Tr. 528.)  He was given a Toradol, orphenadrine, and dexamethasone sodium phosphate injection and discharged the same day.  (Tr. 529.)

Murphy saw his primary care physician, Dr. Richard Hester of the Missouri Highlands Medical Clinic, twelve times between October 2017 and December 2018. During several visits, they discussed Murphy's back pain and seizures. For example, on October 23, 2017, Murphy indicated that he had not suffered a seizure for two weeks and complained of pain in his lower back radiating down his legs, noting that the injections he had received helped to alleviate some of the pain. (Tr. 605.) On November 22, 2017, he rated his back pain as a 10 out of 10. (Tr. 598.) Treatment notes from June 15, 2018 indicate that Murphy saw Dr. Hester for medication refills and discussed his homelessness but raised "no other complaints or concerns." (Tr. 582.) During his September 20, 2018 appointment, however, he reported shoulder and back pain and indicated that his pain medicine was no longer effective. (Tr. 571.) He reported back pain again on October 18, 2018. (Tr. 565.)

During Murphy's December 7, 2018 appointment, Dr. Hester completed a Missouri Department of Social Services form, "Medical Report including Physician's Certification/Disability Evaluation." In this report, Dr. Hester wrote that Murphy experiences grand mal seizures "periodically" and experienced his last seizure a year previously. (Tr. 491.) He wrote that Murphy's chronic back pain "limits duration in one position" and that Murphy "tries to work through it the best he can" but it is "getting worse." (Tr. 491.) He also stated that Murphy had "potential for seizures if he misses medications [which] makes employers hesitant

to hire him." (Tr. 491.) He concluded that Murphy's "chronic pain decreased [his] ability to work [a] full day" and opined that Murphy's disability/incapacity is permanent. (Tr. 491.)

On May 21, 2019, Sarah Oliver, P.A. saw Murphy for a neurosurgery consult. (Tr. 552-54.) At that appointment, Murphy rated his pain level as a 9 out of 10 and described it as "constant" and "made worse by activity." (Tr. 552.) Oliver noted "LLE weakness and left foot drop" and "decreased range of motion (extension), tenderness (diffusely along the posterior lumbar spine and bilateral flanks) and pain (diffusely along the posterior lumbar spine and bilateral flanks)." (Tr. 553.) She also noted an abnormal gait, "slowed, limping on left." (Tr. 553.) After examining Murphy and reviewing his October 2018 MRI, she diagnosed him with lumbar disc degeneration and post laminectomy syndrome. (Tr. 554.) Oliver explained that while Murphy "meets neurosurgical guidelines for a L4-5, L5-S1 lumbar fusion, this would not improve any permanent nerve damage caused by two previous lumbar surgeries." (Tr. 554.) Additionally, she explained that "[t]here is also considerably increased risk for a third lumbar surgery and since [he] is relatively independent at this time, a lumbar fusion is not recommended." (Tr. 554.)

After reviewing Murphy's medical records, Dr. Harry Cole, the state agency consultant, concluded that Murphy could occasionally lift 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8 hour workday; sit

for about 6 hours in an 8 hour workday; and push and/or pull with few restrictions. (Tr. 185.)  Marsha Toll, Psy.D., the state agency psychological consultant, also reviewed Murphy's medical records and determined that while Murphy's mental health problems did affect his understanding and memory, concentration and persistence, social interaction, and adaptation capacities to some degree, he was still "capable of performing simple, repetitive tasks on a sustained basis." (Tr. 187.)  The Personalized Disability Explanation concluded that while Murphy had "some limitations in [his] ability to perform work related activities," his condition was "not severe enough to keep [him] from working." (Tr. 189.)

## HEARING BEFORE THE ALJ

Murphy appeared for his hearing before the ALJ on September 11, 2019.  He was represented by an attorney.  Murphy testified that he has daily back pain that makes it difficult for him to move.  (Tr. 66.)  He takes pain medicine—hydrocodone and diazepam—to control some of his symptoms.   (Tr. 66.)   He also takes medication—Cymbalta and Aristada—to treat his depression and sees a life coach from the Family Counseling Center once a week "to keep [himself] occupied or keep [him] from doing something stupid." (Tr. 66.)  He uses cannabis "once or twice a week" depending on his pain level. (Tr. 67.)  He used to do lawn work for his father but can no longer perform that work because of his leg pain. (Tr. 67.)  He has a hard time being around other people due to his bipolar disorder and spends his days

sleeping and playing games on his phone.  (Tr. 68.)  He is able to perform basic personal grooming, shop for his essentials, attend church, and lift rocks as a form of exercise.  (Tr. 68-69).  He uses a cane to help him walk on days when the pain is most severe.  (Tr. 69.)  On an average day, he can walk for about 15 to 20 minutes uninterrupted before having to sit down and rest, and he can stand for about 30 minutes before having to sit down.  (Tr. 69-70.)  He can sit for about 15 to 20 minutes before having to stretch or lay down.  (Tr. 70.)

After questioning Murphy, the ALJ turned to the vocational expert.  He asked whether an individual similar in age, education, and prior work experience to Murphy, who is limited to performing light exertion level work; can occasionally climb stairs and ramps but never climb ropes, ladders, or scaffolds; can occasionally stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to extreme cold, unprotected heights, excessive vibration, and hazardous machinery could perform Murphy's past work as a caulker.  The vocational expert opined that such an individual would be unable to work as a caulker.   (Tr. 77.)  The ALJ then asked if there were any other jobs in the national or regional economy that an individual with these limitations could perform.  The vocational expert listed three occupations that comport with these limitations: router, price marker, and cleaner.  (Tr. 78.)

The ALJ then changed the hypothetical, asking whether there are any jobs in the national or regional economy that could be performed by an individual similar

in age, education, and prior work experience to Murphy but who is limited to performing sedentary exertion level work; can never climb stairs, ramps, ropes, ladders, or scaffolds; can occasionally balance or stop but not kneel, crouch, or crawl; and should avoid concentrated exposure to extreme cold, unprotected heights, excessive vibration, and hazardous machinery.  (Tr. 78.)  The vocational expert offered three occupations that would comport: addresser, table worker, and document preparer.  (Tr. 78-79.)

For the final hypothetical, the ALJ added the following restrictions: the individual requires occasional unscheduled disruptions of the work day and the work week in order to sit or lie down for extended periods of time; is unable to focus or concentrate for a full eight-hour workday due to pain and/or side effects of medication; and is unreliable in terms of showing up for work.  (Tr. 79.)  The vocational expert said that these limitations were work preclusive.  (Tr. 79.)

## ALJ DECISION

The ALJ found that Murphy met the insured status requirements of the Social Security Act through March 31, 2015 and had not engaged in substantial gainful activity since December 19, 2011.  (Tr. 17.)  The ALJ then determined that while Murphy suffered from seizure disorder, degenerative disc disease post-surgery, spondylosis, bipolar disorder, depression, and THC use disorder, these impairments

did not meet or medically equal the severity of one of or a combination of the listed impairments in 20 C.F.R. § 404.  (Tr. 18.)

Based on his consideration of the record, the ALJ found that Murphy had an RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) but with the following limitations: he can stand and/or walk 6 hours out of an 8 hour day and sit 6 hours out of an 8 hour day; he can lift and/or carry 10 pounds frequently and 20 pounds occasionally; he can occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl, but should never climb ladders, ropes, or scaffolds; and he should avoid concentrated exposure to extreme cold, vibration, unprotected heights, and hazards of machinery.  (Tr. 20.)  Based on Murphy's RFC, the ALJ found that he could not perform his past relevant work as a caulker.  (Tr. 25-26.)  However, the ALJ found that there are other jobs in the national economy that Murphy could perform, including router, price marker, and cleaner.  (Tr. 26.)   Accordingly, the ALJ denied Murphy's applications because he found that Murphy was not under a disability as defined in the Social Security Act.

## ANALYSIS

Murphy argues that the ALJ did not properly evaluate Dr. Hester's December 2018 medical report when considering the evidence in the record.  He contends that "the ALJ inaccurately described the nature and scope of Dr. Hester's opinion." Additionally, Murphy appears to invoke the "Treating Physician Rule" by arguing

that Dr. Hester's opinion should be "accorded substantial weight" because he was Murphy's treating physician.  The Commissioner argues that Dr. Hester's evaluation does not constitute a medical opinion under the new regulations and that the ALJ was therefore not required to evaluate it.

In his decision, the ALJ described Dr. Hester's report as follows:

> …Richard Hester, M.D., the claimant's primary care provider[,] completed a medical report certification/disability evaluation report for the state of Missouri, indicating that due to the claimant's seizure disorder with his last seizure one-year [sic] ago, his mental impairments, and chronic low back pain, these conditions decrease the claimant's ability to work a full day, and that his "potential for seizures if he misses medications makes employers hesitant" (Exhibit C9F at 1-2).  Further, the doctor opined that the claimant's conditions result in "permanent" disability (Exhibit C9F at 2).  Initially, the undersigned notes that it is unclear if the author is familiar with the Social Security Administration's disability evaluation program or the evidence of record.  Moreover, the doctor's statement indicating the claimant has "permanent disability," or is "unable to work, is not a medical opinion, but rather an administrative finding dispositive of a case, and this issue is reserved to the Commissioner, and as such as is not entitled to any special significant weight (20 CFR 404.1527(e)(1)(3) and 416.927(e)(1)(3)).  Because a decision by any governmental or non-governmental agency about a claimant's disability status is based upon its own rules, it is not binding on a Social Security disability decision.  Thus, this opinion provides no persuasive value.

(Tr. 24.)

Because Murphy filed his applications after March 27, 2017, the new Social Security regulations regarding the evaluation of medical evidence applied to his case.  See 20 C.F.R. §§ 404.1520c and 416.920c.  Under the new regulations, ALJs are no longer required to "give any specific evidentiary weight, including controlling

weight, to any medical opinion(s)," including those from treating physicians.  20 C.F.R. § 404.1520c(a), 416.920c(a).  Instead, ALJs are to consider all medical opinions equally and evaluate their persuasiveness according to several specific factors.  See 20 C.F.R. § 404.1520c(b)(2), 416.920c(b)(2) ("The factors of supportability…and consistency…are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative findings to be…We may, but are not required to, explain how we considered the [other listed factors].").

20 C.F.R. §§ 404.1513(a)(2) and 416.913(a)(2) define a medical opinion as:

> [A] statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities…your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching)…

First, because the new regulations clearly eliminated the Treating Physician Rule, the ALJ was not obligated to give any special weight to Dr. Hester's report. Additionally, the report does not constitute a medical opinion under the new regulations.  Dr. Hester wrote that Murphy had periodic seizures and experienced his last one a year ago.  He also stated that Murphy's "potential for seizures if he misses medications makes employers hesitant to hire him."  This is not a medical

finding; instead, it is a conclusion that should have been reserved to the ALJ.[5]  The same is true of the statements that Murphy's "chronic pain decreased [his] ability to work [a] full day" and that Murphy is permanently disabled.  See 20 C.F.R. § 404.1520b(c)(3)(i) and 416.920b(c)(3)(i) (issues reserved to the Commissioner include "statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work").

Furthermore, Dr. Hester's report did not provide any information about what Murphy "can still do" despite his impairments.  The old regulations defined "medical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  See 20 C.F.R. § 404.1527(a)(1).  Under the old regulations, Dr. Hester's report may have been considered a vague medical opinion.  However, when Congress revised the regulations, it explicitly made what a claimant "can still do" the ***central*** component of the definition.  See Revisions to Rules Regarding the Evaluation of Medical Evidence, 2016 WL 4702272, 81 Fed. Reg. 62560-01 (Sept. 9, 2016) ("A more appropriate focus of medical opinions would be perspectives from medical sources about claimants' functional abilities and

---

[5] Furthermore, as the Commissioner points out, "hireability is not a valid consideration in determining disability."  See 20 C.F.R. §§ 404.1520b(c)(3)(i), 416.920b(c)(3)(i).

limitations" rather than claimants' "[d]iagnoses and prognoses [which] do not describe how an individual functions."). Although some of Dr. Hester's assertions may not be clear-cut disability conclusions—such as his statements that Murphy experiences seizures "periodically" and that his back pain "limits duration in one position" and "is getting worse"—they also do not describe what Murphy "can still do." Additionally, even if these statements could be interpreted as descriptions of Murphy's functional capabilities, they would not provide any support for fashioning a different RFC given their vagueness.

For these reasons, Dr. Hester's report does not constitute a medical opinion. The ALJ therefore did not err in deeming it unpersuasive and was not required to evaluate its supportability and consistency with the rest of the record.

The written decision demonstrates that the ALJ carefully considered the other evidence in the record. The ALJ wrote that "[t]he record confirms [Murphy] has a history of treatment for musculoskeletal pain and seizures; however, the objective evidence and medical records do not support [Murphy's] allegations of debilitating functional impairment." (Tr. 21.) It appears that Murphy has not suffered a seizure since June 2017. (Tr. 418.) The record therefore supports the conclusion that Murphy's seizure disorder is well-controlled.[6] Additionally, as to Murphy's mental

---

[6] In the decision, the ALJ wrote that since June 2017, Murphy "has denied any additional seizure activity, or problems with his medications, which strongly suggests that with treatment compliance, [his] seizures are well-controlled." (Tr. 24.) It is unclear from the record the extent

health, there is evidence in the record—including Murphy's own testimony—indicating that he is taking the appropriate medications and is seeing a life coach to discuss his goals and plans.  (Tr. 66, 481-82.)  While some providers indicated that Murphy exhibited signs of anxiety (Tr. 449), most of the records note that he displayed a "normal" demeanor and attitude and was able to communicate properly.  (Tr. 442, 480.)  The most recent records, from Murphy's May 2019 visit with Sarah Oliver, P.A., state that he reported no "confusion," "suicidal ideas," nerves, or anxiety.  (Tr. 553.)  As a result, the record adequately supports the ALJ's finding that Murphy's mental health problems are "generally well controlled."  (Tr. 24.)  Finally, while Murphy clearly experiences back pain, the record does not demonstrate that it is so debilitating that he cannot work.  While Murphy appears to have questioned the efficacy of his pain medicine on certain occasions (Tr. 571), there is evidence in the record showing that various medications and injections have helped diminish the pain.  (Tr. 443, 529, 605.)  Although some of the records noted a limp, "irregular" gait, reliance on his cane, or decreased sensation in his left foot, (Tr. 553, 561, 601, 602), the majority indicated that he had a "normal" gait and did

---

to which Murphy remained compliant with his prescribed anti-seizure medication.  As discussed above, when Murphy went to the emergency department following his seizures in June 2017, lab tests revealed "low" levels of Dilantin in his system.  (Tr. 431.)  Months later, at his October 23, 2017 appointment with Dr. Hester, Murphy reported that he "has been off of his Dilantin for approx. 2 weeks and has been seizure free."  (Tr. 605.)  At the hearing before the ALJ, Murphy did not indicate that he had resumed taking Dilantin or any other anti-seizure medication.  Instead, he stated that he was taking hydrocodone, diazepam, Cymbalta, and Aristada.  (Tr. 66).

not appear to have trouble walking.  (Tr. 383, 441-42, 561, 564, 568, 572, 575, 579, 583, 586, 590, 594, 598, 605.)  While Sarah Oliver, P.A. noted an abnormal, limping gait and decreased range of motion when she examined Murphy in May 2019, she also explained that he was not a good candidate for a third lumbar surgery due to his scar tissue and the fact that he "is relatively independent at this time."  (Tr. 554.) This evidence supports the ALJ's conclusion that Murphy's degenerative disc disease and spondylosis do not render him disabled within the meaning of the Social Security Act.

The ALJ also properly considered the other medical opinions offered.  He found Marsha Toll's psychological assessment persuasive and explained how it was supported by the overall record.  (Tr. 25.)  He also found Dr. Cole's opinion persuasive, and even "tempered [Cole's] assessment to [Murphy's] benefit by adding postural and environmental restrictions, based upon the evidence and testimony received at the hearing level, and to adequately accommodate [Murphy's] subjective complaints, and history of seizure activity."  (Tr. 25.)

Finally, the ALJ considered Murphy's own testimony about his ability to perform various daily activities and concluded that his subjective allegations were not fully consistent with the medical evidence and other evidence in the record.  (Tr. 25.)  I must "defer to the ALJ's determinations regarding the credibility of witnesses so long as such determinations are supported by good reasons and substantial

20

evidence." <u>Vester v. Barnhart</u>, 416 F.3d 886, 889 (8th Cir. 2005).  On different occasions, Murphy asserted that he can clean and do laundry, yard work, and household and car repairs.  (Tr. 330, 398, 477.)  He also indicated that he goes to church and has "exercised regularly." (Tr. 400.)  Records from some of Murphy's appointments provide additional insight into his physical capabilities; at various times, he reported having lifted furniture (Tr. 590) and played ball (Tr. 431, 579.)  Additionally, as discussed above, he does not consistently appear to have trouble walking.  This kind of evidence undercuts Murphy's claims of debilitating pain and supports both the ALJ's credibility determination and his conclusion that Murphy had an RFC to perform light work with certain limitations.  <u>See</u> <u>Medhaug v. Astrue</u>, 578 F.3d 805, 817 (8th Cir. 2009) ("Acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain.").

Although Murphy believes that the ALJ should have assessed the medical evidence differently to support greater limitations, it is not my role to reweigh the evidence considered by the ALJ in his determination of a plaintiff's RFC.  <u>Hensley v. Colvin</u>, 829 F.3d 926, 934 (8th Cir. 2016).  It is the ALJ's duty to weigh conflicting evidence and to resolve disagreements among medical opinions.  <u>Cline v. Colvin</u>, 771 F.3d 1098, 1103 (8th Cir. 2014).  Here, the ALJ did not substantially err when he concluded that Dr. Hester's report was not a medical opinion and

deemed it unpersuasive, and instead found the medical source statements from the state agency reviewer persuasive as consistent with, and supported by, the evidence as a whole.  Such a determination does not constitute reversible error as the new regulations permit the ALJ to consider this evidence as appropriate, since he is no longer obligated to follow the Treating Physician Rule or otherwise provide "good reasons" for failing to do so. 20 C.F.R. § 416.920a(b)(1).

The ALJ evaluated all of the medical evidence of record and adequately explained his reasons for the weight given this evidence in a manner consistent with the new regulations.  Substantial evidence in the record as a whole supports the ALJ's RFC determination, so I will affirm the decision of the Commissioner as within a "reasonable zone of choice."  Fentress v. Berryhill, 854 F.3d 1016, 1021 (8th Cir. 2017) (citing Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008)).

Accordingly,

**IT IS HEREBY ORDERED that** the decision of the Commissioner is affirmed, and Timmothy Murphy's complaint is dismissed with prejudice.

A separate Judgment is entered herewith.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 19th day of July, 2021.